**Marciano Arraga MARTINEZ,**
**Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–89–00115–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

May 31, 1990.

R.K. Hansen, Houston, for appellant.

John B. Holmes, Jr., Harris Co. Dist. Atty., Calvin Hartmann, Asst. Dist. Atty., John Bradley, for appellee.

Before SAM BASS, HUGHES and O'CONNOR, JJ.

## OPINION

O'CONNOR, Justice.

This is an appeal from a conviction for possession of marihuana. Marciano Martinez, appellant, pled guilty, and the court assessed appellant's punishment at four years imprisonment. We reverse and remand.

The grand jury indicted appellant for two crimes arising from the same incident. In cause number 516288, appellant was indicted for auto theft, and in cause number 516287, he was indicted for possession of marihuana. Appellant filed a motion in both cases to suppress the evidence. After a hearing on the motion to suppress, the court dismissed cause number 516288, the auto theft case, and appellant was tried and convicted in cause number 516287, the marihuana case. The State did not file a notice of appeal in the auto theft case, and therefore, the only case before us is the marihuana case.

The only issue on appeal is whether the trial court erred in refusing to suppress the evidence in the marihuana case. In his motion to suppress, appellant contended that the evidence was seized as the result of an illegal search. In support of the motion, appellant filed four affidavits, his own, his wife's, his 15–year–old daughter's, and his attorney's.

Appellant stated in his affidavit: He does not speak English. On the day he was arrested, he was in his garage with both doors closed. Garrett came in the garage without his permission, and said something to him in English, which he did not understand. His 15–year–old daughter came into the garage at the time and told him that Garrett was telling him to open the large door. She opened the door. (In his affidavit, Officer Null said a Mexican male opened the door.) At the time of the entry, there was no fire or emergency and very little smoke in the garage from his cutting torch. After the large garage door was opened, Garrett looked around his garage without appellant's permission. A few minutes later, several police officers arrived and, without getting his permission, searched his garage. Appellant did not say anything to the officers because he thought he was under arrest and it was better to say nothing. The officers made him sit in a corner, and he could not move. When he asked to move, at least one officer always escorted him, holding him by his arm. The officers told him he was under arrest, but he did not understand why. One of the officers gave him a card written in Spanish, which mentioned certain legal rights. After he read the card, an officer escorted him into his house, and told him to get the key to the storage area. The officer did not tell him he had the right to refuse entry into the storage area, and he did not believe he had a choice because the officers had already searched the other parts of the garage. When getting the key, his daughter told him the officers said they were going to arrest everyone in the family. He could see his wife and children crying. The officers did not present him with any type of legal paper, such as a warrant, and entered his garage without his consent.

The affidavits of appellant's wife and daughter largely corroborate appellant's affidavit. The attorney's affidavit stated that he has known appellant since 1987 and appellant does not speak English, except certain phrases. Most of his communication in English, the attorney said, was mimicry. The attorney said he needed an interpreter to speak with appellant.

In response, the State filed the affidavits of Officers Garrett and Null giving their account of the search. Garrett is an arson investigator for the Pasadena Fire Marshall's office, and Null is an officer of the Pasadena Police Department.

Garrett stated in his affidavit: He responded to a fire alarm at the 500 block of Willow, where he saw black smoke coming from an open walk-in door of a rear garage building. A Mexican male standing outside the walk-in door told Garrett that the smoke was from barbecue. The smoke did not smell like barbecue to Garrett. He did not see that Mexican male again. Garrett stepped to the walk-in door, and saw appellant with a lit cutting torch in his hand, cutting across the roof of a late model car, from which much of the body work had been removed. The smoke in the garage was very thick. Garrett told appellant in English to turn off the torch, which he did. Garrett saw another Mexican male in the garage whom he told to open the drive-in garage door. That man opened the door, and then got in a car parked close to the street and drove away. As the smoke cleared, Garrett saw the various parts of the car lying around the garage, and noticed no license plate was visible on the car. He examined the car's dash area where the VIN number should have been, and saw marks where it had been chiseled off. Garrett called for a police officer to investigate a possibly stolen car. In five to ten minutes, Officer Null arrived.

Null stated in his affidavit: After Garrett told him what he had seen, Null inspected the vehicle, could not find a VIN number on the dash, but found the manufacturer's confidential number on the fire-

wall. Another firefighter found a bag on the garage floor, which contained the VIN tag and crumpled license plates. From this information, they were able to determine the car was stolen. Null then noticed a small storage area on the west wall of the garage, looked inside and saw a locked cabinet. Without physically restraining him, Null told appellant he was under arrest for the stolen vehicle, and read him his Miranda warnings in English. Appellant responded that he understood most of the warnings. In response to a question by Null, appellant indicated he could read Spanish. Null gave him a card with the Miranda warnings written in Spanish. Appellant read it and said he understood his rights. Null then asked appellant for access to the storage area. Null went with appellant into his house, where appellant got the key to the storage area from his wife. Appellant unlocked the door to the storage area, and Null looked inside. He found three large bags of what he thought was marijuana, which he seized. Null handcuffed appellant and had him taken to jail.

Appellant's sole point of error is that the warrantless search of appellant's garage and his arrest were unreasonable under the fourth amendment of the U.S. Constitution and article I, section 9 of the Texas Constitution. Appellant argues that the trial court should have suppressed everything the State seized.

Appellant argues that state and federal law presume warrantless searches are unreasonable per se unless they fall within certain limited exceptions, citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Kolb v. State*, 532 S.W.2d 87, 89 (Tex.Crim.App. 1976); *cf. Vasquez v. State*, 663 S.W.2d 16, 24 (Tex.App.—Houston [1st Dist.] 1984), *affirmed*, 739 S.W.2d 37 (Tex.Crim.App. 1987). The State responds by citing the emergency doctrine.

■ The emergency doctrine is an exception to the rule that public officials must have a warrant issued by a magistrate to authorize an unconsented to entry to a citizen's building. *Bray v. State*, 597

S.W.2d 763, 764 (Tex.Crim.App.1980). Thus, for example, fire fighters may enter a burning building without a warrant or the occupant's consent. *Id.; cf. Roeder v. State*, 768 S.W.2d 745, 749 (Tex.App.— Houston [1st Dist.] 1988, pet. ref'd). The protections of the fourth amendment, however, require that the scope of the search be limited to the emergency circumstances justifying the warrantless search and no farther. *Id.*

In the *Bray* case, an officer was told to check by with an ambulance to investigate a drug overdose and possible death. 597 S.W.2d at 765. When the police officer arrived, the emergency medical personnel told him there was no longer a medical emergency. The court held that from that point, the officer was no longer responding to an emergency. *Id.* at 768. As a result, the officer's search of the premises—which led to the arrest of defendant who was using a controlled substance in the bathroom—was not justified. *Id.* at 767.

In the *Roeder* case, the police searched an apartment for kidnap victims after a co-defendant confessed that the victims were held in the apartment four days before. Even though the officers testified they thought the victims were already dead, they entered the apartment without a warrant. They did not find the victims. The police then called a special investigator to conduct a thorough search of the apartment. It was the special investigator who found evidence that linked defendant to the crime. We held that, at the time of the search, the police were no longer operating under an emergency. 768 S.W.2d at 749. Thus, the search was not justified.

■ In this case, once Garrett determined there was no fire, his justification for being on the premises ended. *Bray v. State*, 597 S.W.2d at 768; *Roeder v. State*, 768 S.W.2d at 749. The State argues however, that even if appellant's arrest was illegal, appellant's consent to the search was voluntary and was not tainted by the arrest.

In *Lopez v. State*, 663 S.W.2d 587, 590 (Tex.App.—Houston [1st Dist.] 1983, pet. ref'd), we said whether a consent to search

was voluntary or coerced is a question of fact to be determined by the court "from the totality of circumstances." That a person is under arrest does not prevent the person from giving a voluntary consent to search. *See Kolb,* 532 S.W.2d at 89; *Lopez v. State,* 663 S.W.2d at 591.

■ An individual may consent to a search and thus waive the fourth amendment protections against unreasonable searches and seizures. *Meeks v. State,* 692 S.W.2d 504, 509 (Tex.Crim.App.1985). The test of waiver of constitutional rights is set out in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). *Kolb,* 532 S.W.2d at 89 n. 2. In order to waive a constitutional right, a party must intentionally relinquish a known right or privilege. *Johnson* 304 U.S. at 464, 58 S.Ct. at 1023; *Kolb,* 532 S.W.2d at 89. When the State relies on a consent to justify a search, the State must prove that the consent was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968).

■ When the accused and the police present conflicting versions of the search, it is the trial court's duty as the trier of fact to resolve conflicts. *Stephenson v. State,* 494 S.W.2d 900, 904 (Tex.Crim.App. 1973); *Lopez v. State,* 663 S.W.2d at 591. As the fact-finder, it is the court's prerogative to believe the officers' version of the facts and disbelieve that of the appellant. *Stephenson* 494 S.W.2d at 904; *Lopez v. State,* 663 S.W.2d at 591.

■ In determining whether a consensual search, conducted after an illegal arrest, is tainted by that illegal arrest, we analyze the following four factors:

(1) The giving of the Miranda warnings;

(2) The temporal proximity of the arrest and the search;

(3) The presence of intervening circumstances; and

(4) The purpose and flagrancy of the officers' conduct.

*Bell v. State,* 724 S.W.2d 780, 788 (Tex. Crim.App.1986); *cf. Cruz v. State,* 764 S.W.2d 302, 305 (Tex.App.—Houston [1st Dist.] 1988, no pet.).

1. The giving of the Miranda warnings

■ Appellant was given his Miranda warnings in English, of which he has little understanding. The officers gave appellant, who has a fourth grade education, a card with the Miranda warnings in Spanish.

The Miranda warnings do not cover a defendant's rights to refuse to consent to a search. Nothing indicates that the officers gave appellant notice that he had a right to refuse to consent to the search. The police need not inform a person of his right to refuse to consent to search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 231–32, 93 S.Ct. 2041, 2049–50, 36 L.Ed.2d 854 (1973); *Juarez v. State,* 758 S.W.2d 772, 781 n. 5 (Tex.Crim.App.1988). It is, however, good police practice to tell the accused that he has the right to refuse to consent to search. *Juarez* 758 S.W.2d at 781 n. 5. When the State can show the accused was told he had the right to refuse to consent to the search, it is evidence that the accused gave a valid consent. *Id.*

Of the four factors, the Miranda warnings are the least important when dealing with a fourth amendment challenge, as here. *See DeVoyle v. State,* 471 S.W.2d 77, 80 (Tex.Crim.App.1971), (Miranda warnings, although not necessary in consent to search case, are "good police practice"); *Cruz,* 764 S.W.2d at 305 (Miranda warnings were the least important factor in determining if a consent to a search was voluntary).

2. The temporal proximity of the arrest and the search

The officers asked appellant for his consent to search immediately after the illegal arrest.

3. The presence of intervening circumstances

There were no intervening circumstances between the illegal arrest and the request for consent to search. The only circumstances which intervened actually heightened the effect of the illegal arrest. Appel-

lant, in the custody of one of the officers, was taken into his house. Appellant told his daughter that they were all in trouble and the police were going to arrest them. The police officer asked appellant's daughter to interpret the request for a consent to search for her father.

4. The purpose and flagrancy of the officers' conduct

Once the emergency abated, the police did not have any probable cause to remain on appellant's property.

\* \* \*

Applying this four-prong test, we find that the taint of appellant's illegal arrest was not removed by the consent to search he gave the officers. We sustain appellant's sole point of error.